# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RODNEY PROSSER, individually and as Sellers' Representative, FRANK RUDDY, and KOK WAYNE WONG, | ) ) ) ) ) | C.A. No. N25C-08-284 MAA CCLD |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PHARMALOGIC HOLDINGS CORP., | ) ) ) | |
| Defendant. | ) | |

Submitted: April 22, 2026
Decided: July 7, 2026

*Defendant's Motion to Dismiss the Amended Complaint:*
**GRANTED in part; DENIED in part.**

## MEMORANDUM OPINION

John H. Newcomer, Jr., Esquire, Kirsten A. Zeberkiewicz, Esquire, Barnaby Grzaslewicz, Esquire (Argued), Alena Smith, Esquire, MORRIS JAMES LLP, Wilmington, DE. *Attorneys for Plaintiffs*.

Ryan D. Stottmann, Esquire, Cassandra L. Baddorf, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Joseph P. Rockers, Esquire (Argued), Brendan Blake, Esquire, GOODWIN PROCTER LLP, Boston, MA. *Attorneys for Defendant PharmaLogic Holdings Corp*.

**Adams, J.**

**INTRODUCTION**

This action concerns a dispute between the buyer and sellers of a business over a post-closing earnout scheme. The sellers contend the buyer changed the operations of the business to reduce EBITDA and avoid an earnout payment, in violation of the parties' contract. The buyer moved to dismiss, contending the sellers' breach of contract claim is subject to an alternative dispute resolution provision which requires resolution of the claim before an independent auditor, is time barred, and fails to state a claim for which relief can be granted. For the reasons explained herein, the Court disagrees with the buyer and denies the motion as to the breach of contract claim.

Separately, the sellers bring a declaratory judgment claim seeking a declaration that the buyer materially breached the parties' contract and therefore the sellers are excused from bringing their breach of contract claims before the independent auditor. The buyer contends the sellers waived this argument by continuing to perform under the contract after the purported material breach. The Court agrees with the buyer but finds the relevant breach claim was nonetheless not subject to the independent auditor's review.

Finally, the sellers contend that the business sold to the buyer received tax refunds for pre-closing tax payments and that the sellers are entitled to those refunds because the business was treated a pass-through entity for taxation purposes.

1

Because the parties' contract does not explicitly address this issue, sellers contend their claims for the tax refund are viable pursuant to the implied covenant of good faith and fair dealing's gap-filling capabilities or the doctrine of unjust enrichment. The buyer contends the existence of a contract which comprehensively addresses tax issues precludes these claims. For the reasons explained herein, the Court agrees with the buyer. This Memorandum Opinion resolves the buyer's motion to dismiss.

**FACTS**

The factual background outlined herein is drawn from the Amended Complaint,[1] accepting all well-pled allegations as true only for purposes of this Motion, as is required for a Rule 12(b)(6) motion to dismiss.[2] The Court will not necessarily use terms like "alleged" throughout. The Court intends to convey no agreement with the truth of the matters asserted in the Complaint. The veracity of the Complaint's allegations can be resolved after discovery.

## I. The Parties

Plaintiffs Rodney Prosser, Frank Ruddy, and Kok Wayne Wong ("Plaintiffs") are individuals residing in New Jersey.[3] Defendant PharmaLogic Holdings Corp. is a Delaware Corporation (Defendant).[4] Plaintiffs founded and developed a nuclear

---

[1] D.I. 13. Citations to the Amended Complaint are in the form of "AC ¶ X." Citations to exhibits to the Amended Complaint are in the form of "AC Ex. X."
[2] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).
[3] AC ¶¶ 8-10.
[4] *Id.* ¶ 11.

pharmacy business (the "Business"), which they sold to Defendant pursuant to the Parties' Securities Purchase Agreement ("SPA").[5] Under the SPA, Plaintiffs are the "Sellers," and Defendant is the "Buyer."[6]

## II. Plaintiffs sell the Business.

Plaintiffs operated the Business out of two pharmacy locations in New Jersey and one in New York.[7] In 2015, Plaintiffs began contemplating retirement and sought to sell the Business.[8] Plaintiffs and Defendant commenced negotiations regarding a potential sale, ultimately culminating in the execution of the SPA on March 20, 2020.[9] The sale of the business closed on January 6, 2021.[10]

Under the SPA, Plaintiffs sold the Business for $30,000,000 plus an earnout payment.[11] Pursuant to the Earnout Provision, the SPA provides that, if the business hit certain earnings before interest, taxes, depreciation, and amortization ("EBITDA") levels by a certain date (an earnout target), Plaintiffs would be entitled to an additional payment.[12] Specifically for purposes of this action, the earnout

---

[5] *Id.* ¶ 2.
[6] *Id.* ¶¶ 8-11.
[7] *Id.* ¶ 17.
[8] *Id.* ¶ 18.
[9] AC ¶ 22.
[10] *Id.*
[11] *Id.* ¶ 23; AC Ex. 1 ("SPA") at 1.
[12] SPA § 2.6. Section 2.6 provides, in part:
> if, during the Earnout Period, the Company achieves EBITDA greater than or equal to $7,000,000, but less than or equal to $7,499,999, Buyer shall pay to the Sellers' Representative, for further distribution by the Sellers' Representative to the Sellers in accordance with the allocations set forth on Schedule 2.3(c), $6,600,000, as an additional purchase price payment, pursuant to the procedures set forth in this

3

provision provided that, if the Business's EBITDA, at the assessment date, lay between $7 million and $7.5 million, Plaintiffs would be entitled to a earnout payment of $6.6 million.[13] Pursuant to an amendment to the SPA, the relevant earnout period after which the EBITDA would be assessed was defined as the twelve months following July 1, 2021.[14] During this earnout period, Defendant's authority to manage the Business was restricted, as they promised "to act in good faith and operate the Business in a manner that is not designed or intended to impede or interfere with EBTIDA and not take, or cause to be taken, any action intended to decrease EBITDA."[15]

Pursuant to the SPA, after the earnout period closed, Defendant was to present an EBITDA calculation, "prepared in good faith," to Plaintiffs "together with reasonably detailed supporting documentation" (the "Earnout Statement").[16] Plaintiffs would have the opportunity to dispute the Earnout Statement via a notice of non-acceptance, potentially triggering resolution via an independent auditor.[17]

---

Section 2.6;… if, during the Earnout Period, the Company achieves EBITDA greater than or equal to $7,500,000, but less than or equal to $7,999,999, Buyer shall pay to the Sellers' Representative, for further distribution by the Sellers' Representative to the Sellers in accordance with the allocations set forth on Schedule 2.3(c), $9,900,000, as an additional purchase price payment, pursuant to the procedures set forth in this Section 2.6;…*et cetera*.

[13] SPA § 2.6(a)(i).
[14] AC Ex. 2.
[15] SPA § 2.6(e) (citation modified).
[16] *Id*. § 2.6(b).
[17] *Id*. § 2.6(c).

During the earnout period, Defendant was to provide Plaintiffs with (at least) quarterly reports, including "a written statement showing an estimated calculation of EBITDA based on the period beginning on the day after the Closing Date through the date such quarterly estimate is provided, along with reasonable supporting financial statements and…quarterly financial statements within twenty (20) Business Days of quarter's end."[18]

If Plaintiffs disputed the EBITDA calculation and resulting earnout payment proposed by Defendant, an independent auditor (the "Auditor") would be employed to resolve "any remaining disagreements in respect of the [Earnout] Statement" not resolved by the Parties.[19] Specifically, the Auditor would "act as an arbitrator to determine…only the amounts of each component on the [Earnout] Statement disputed" by Plaintiffs.[20]

The SPA also addressed issues regarding taxation of the Business. The SPA contains a robust provision concerning "Tax Matters,"[21] and contains a provision requiring Plaintiffs to indemnify Defendant in the event the government concluded Plaintiffs' pre-closing tax payments on behalf of the business were deficient and required a further payment.[22] The Business, an S-corporation, operated as a pass-

---

[18] *Id*. § 2.6(b).
[19] *Id*. § 2.4(d).
[20] *Id*. § 2.4(d)(iii).
[21] SPA § 7.2
[22] *Id*. § 9.2(a)(iii).

through entity for purposes of taxation, with the Plaintiffs being financially responsible for the Business's taxes before the sale.[23]

### III. Defendant delivers the Earnout Statement, and disputes ensue.

On August 31, 2022, Defendant delivered its Earnout Statement, calculating the Business's EBITDA at $6.8 million—$200,000 short of the target which would have qualified Plaintiffs to a $6.6 million earnout payment.[24] The Earnout Statement provided was a single-page document unaccompanied by analysis.[25]

Plaintiffs responded by requesting financial information for each of the Business's three locations.[26] Prior to the sale, Plaintiffs had maintained financial records such as balance sheets and general ledgers at the pharmacy site level for the Business.[27] The Parties commenced months of dialogue in which Plaintiffs sought further information underlying the conclusions of the Earnout Statement and Defendant failed to satisfy.[28]

On February 9, 2023, Defendant provided a spreadsheet supporting Defendant's Earnout Statement which revealed changes implemented during the earnout period.[29] Specifically, the data provided on February 9, 2023 showed that

---

[23] AC ¶ 75.
[24] AC Ex. 3.
[25] *Id.*
[26] AC ¶ 32.
[27] *Id.* ¶ 61.
[28] *Id.* ¶¶ 33-37.
[29] *Id.* ¶¶ 38-39

the bad debt provided on the Business's books was significantly higher than prior years, that the Business had incurred expenses implementing a new 401K matching program and bonuses for sales personnel, and had incurred over $170,000 of additional expenses by changing to a new product supplier.[30] Plaintiffs ultimately determined that the increased bad debt was the result of a shift in the way bad debt was accounted for on the Business's books.[31] Plaintiffs requested site-specific financial information, and were informed that the Business no longer maintained site-specific balance sheets.[32] Plaintiffs' request for site-specific general ledgers was ignored.[33] After this exchange, Plaintiffs sent two letters to Defendant, explaining they did not accept the Earnout Statement provided (the letters, together, the "Notice of Non-Acceptance").[34] The Notice of Non-Acceptance identified specific issues with the Earnout Statement, including those articulated above regarding the bad debt accounting, 401k matching, sales personnel bonuses, change in supplier.[35] The Notice of Non-Acceptance further reiterated the request for site-specific financial records.[36]

---

[30] *Id.*
[31] *Id.* ¶¶ 65-66.
[32] AC ¶ 40.
[33] *Id.*
[34] *Id.* ¶¶ 41-42.
[35] AC Ex. 14.
[36] *Id.*

The Parties attempted to resolve the dispute for more months and, ultimately, *years*.[37] During this period, Plaintiff Wong, who had stayed on as an employee of the Business after closing, attempted to investigate the issues highlighted by Plaintiffs.[38] Wong's post-closing role in the Business's sales department was "strictly transitional," and he was not provided with financial records pursuant to his role.[39] Wong was able to reconcile some of the Plaintiffs' highlighted discrepancies by investigating sales data.[40]

The Business incurred tax refunds related to tax overpayments made by Plaintiffs before closing.[41] Defendant retained these tax refunds, an act to which Plaintiffs object.[42]

## IV. Procedural History

On August 29, 2025, Plaintiffs filed the instant action.[43] On October 27, 2025, Defendant filed a motion to dismiss Plaintiffs' Complaint.[44]

On November 19, 2025, Plaintiffs filed an Amended Complaint, claiming Defendant breached Section 2.6(e) of the SPA (the provision providing that

---

[37] *See generally* AC ¶¶ 44-55.
[38] AC ¶ 49.
[39] *Id.*
[40] *Id.*
[41] AC ¶¶ 77-96.
[42] *Id.* ¶¶ 80, 87, 95-96.
[43] D.I. 1. The initial complaint is dated August 29, 2025, but the online docket shows a filing date of September 8, 2025. The August 29, 2025 date is operative.
[44] D.I. 9-10.

Defendant would operate the business in good faith and not take action to interfere with the Business's EBITDA) by (1) failing to maintain site-specific financial records and (2) changing the Business's "historical business, operations and accounting practices to decrease the Company Group's EBITDA" (Count I).[45] Plaintiffs further seek a declaratory judgment that (1) Defendant materially breached the SPA by breaching Section 2.6(b) (which required Defendant to provide the Earnout Statement in good faith and with "reasonably detailed supporting documentation"); (2) Defendant's material breach relieved Plaintiffs of the obligation to follow the resolution via independent auditor provision in the SPA; and (3) that Defendant needed to provide site-specific financial information in order to comply with Section 2.6(b) (Count II).[46] Finally, Plaintiffs claimed Defendant either violated the SPA's implied covenant of good faith and fair dealing (Count III) or was unjustly enriched (Count IV) in retaining tax returns for pre-closing overpayments.[47]

Defendant moved to dismiss the Amended Complaint, contending Count I must go before the Auditor pursuant to the SPA and that Counts I-IV fail to state a claim for which relief can be granted.[48] Defendant's motion to dismiss is fully briefed.[49] The Court heard oral argument on the motion to dismiss on March 23,

---

[45] AC ¶ 101.
[46] *Id.* ¶ 109.
[47] *Id.* ¶¶ 110-141.
[48] D.I. 16.
[49] D.Is. 16, 18, 21. Citations to Defendant's opening brief are in the form of "OB at X." Citations to Plaintiffs' answering brief are in the form of "AB at X." Citations to exhibits to Plaintiffs'

9

2026.[50]  On April 22, 2026, the Court received the transcript of the March 23, 2026 oral argument, and took the matter under advisement.[51]

## LEGAL STANDARD

Defendant moves to dismiss the Amended Complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6).[52]  The "pleading standards governing the motion to dismiss stage…are minimal."[53]  The court must "accept all well-pleaded factual allegations in the [complaint] as true."[54]  The court also must "read the complaint generously" and construe all such allegations "in a light most favorable to the [plaintiff]."[55]  The court "credits even vague allegations, so long as they provide the opposing party notice of the claim;…gives the non-movant the benefit of all reasonable factual inferences; and…denies the motion if recovery on the claim is reasonably conceivable."[56]  Dismissal pursuant to Rule 12(b)(6) is appropriate only where a complaint is so deficient that the plaintiff "could not recover under any reasonably conceivable set of circumstances susceptible of proof."[57]

---

answering brief are in the form of "AB Ex. X."  Citations to Defendant's reply brief are in the form of "RB at X."

[50] D.I. 26.

[51] D.I. 27

[52] D.I. 16.

[53] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (citation omitted).

[54] *Id.*

[55] *Aramark US Offshore Servs., LLC v. Amity Lodges LTD*, 2022 WL 17087052, at *1 (Del. Super. Nov. 21, 2022) (citing *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del. 1993), *as corrected* (Dec. 8, 1993)).

[56] *Agahi v. Kelly*, 2024 WL 1134048, at *7 (Del. Super. Mar. 15, 2024).

[57] *Cent. Mortg.*, 27 A.3d at 536 (citation omitted).

Motions to dismiss in favor of alternative dispute resolution are commonly addressed as motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).[58] In resolving such a motion, the court may consider documents outside of the complaint.[59] The court will dismiss a complaint in favor of alternative dispute resolution if the dispute, on its face, falls within the alternative dispute resolver's authority as provided in the relevant agreement between the parties.[60]

## ANALYSIS

### I. Count I is not dismissed.

Defendant argues Plaintiffs' breach of contract claim should be dismissed in favor of the SPA's alternative dispute resolution provision.[61] The SPA states that an independent Auditor has the authority to resolve "only the amounts of the Earnout Statement disputed" by Plaintiffs.[62]

The relevant alternative dispute resolution provision is not a true arbitration provision, even though it refers to the Auditor acting as an "arbitrator."[63] Regardless of the "label the parties use" for the Auditor, the Auditor's role here is "far enough

---

[58] *See, e.g. Behm v. Am. Int'l Gp., Inc.*, 2013 WL 3981663, at *4 (Del. Super. July 30, 2013).
[59] *Id*. (citation omitted).
[60] *Schwaber v. Margalit*, 2022 WL 2719952, at *2 (Del. Ch. July 13, 2022) (citation omitted).
[61] OB at 16.
[62] SPA §§ 2.4(d)(iii), 2.6(c) (citation modified).
[63] *Id*. § 2.4(d)(iii).

along the spectrum" of alternative dispute resolution provisions "that it is not legal arbitration."[64]

In arguing the instant breach of contract claim should be dismissed in favor of resolution by the Auditor, Defendant highlights the two categories of issues raised by Plaintiffs.[65] The first category is the "Books-and-Records Issue," in which Plaintiffs contend Defendant provided inadequate information supporting Defendant's Earnout calculation because the appropriate records did not exist.[66] The second category, in which Plaintiffs contend that Defendant improperly altered the Business's "historical business, operations, and accounting practices to decrease the [Business's] EBITDA,"[67] is defined as the "Earnout Statement Issues."[68]

### 1. The Books-and-Records Issue falls outside of the Auditor's Authority.

Defendant contends the Auditor has the authority to resolve the Books-and-Records Issue, as a dispute over the documents providing the basis for an EBITDA calculation falls within both the Auditor's contractual authority and professional expertise.[69] Defendant further contends Plaintiffs are engaging in artful pleading, attempting to circumvent the Auditor by arguing Defendant failed to *maintain*

---

[64] *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 994 (Del. Ch. 2023).
[65] OB at 17.
[66] *Id.*
[67] AC ¶ 101.
[68] OB at 17.
[69] *Id*. at 18.

certain documentation instead of arguing Defendant failed to *provide* that documentation.[70]

Plaintiffs contend the Books-and-Records Issue falls outside of the Auditor's limited contractual authority, which enables the Auditor to resolve "only the amounts" in dispute.[71]

The Auditor's authority is defined using "contract interpretation principles."[72] Accordingly, while the Auditor may have expertise in resolving issues over what accounting documentation must be maintained by the Business, the language of the SPA governs the Court's analysis of this issue.

Both parties reference *Katz v. Infusion Services Management, LLC*,[73] in which this Court dismissed a post-closing "True-Up" dispute in favor of an independent auditor.[74] The Court has examined the SPA's alternative dispute resolution provision against that in *Katz*, and the two are very similar. In *Katz*, this Court sent disputes regarding which records the buyer kept after closing to an independent auditor.[75] The *Katz* provision, however, provided the auditor with the enumerated authority to

---

[70] *Id.* at 20.
[71] AB at 17.
[72] *Lytle v. Lytle Intermediate, LLC*, 2026 WL 50135, at *5 (Del. Ch. Jan. 7, 2026) (citing *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 619 (Del. 2023)).
[73] 2025 WL 2979825 (Del. Super. Oct. 22, 2025).
[74] OB at 20; AB at 25.
[75] 2025 WL 2979825, at *2.

resolve disputes about what financial records should have been provided by the buyer.[76] This enumerated power is not provided to the Auditor in the SPA.

Defendant attempts to parry this point by noting that the Court did not rely on this provision in resolving *Katz*.[77] While it is true that this Court did not reference (in its brief order) the *Katz* auditor's enumerated authority to resolve disputes about which records the buyer provided, the Court does not agree with Defendant's reasoning. Defendant essentially asks the Court to declare that two contracts—one of which explicitly sends disputes about record keeping to an independent auditor while the other does not—command the same result. Such an argument renders the additional provision present in *Katz* but absent here redundant and superfluous.[78] Accordingly, *Katz* is distinct from the instant case insofar as it allocates disputes over record-keeping to an auditor, and reliance on *Katz* does not resolve the issue of where the Books-and-Records Issue must be heard.

---

[76] AB at 24 n. 64 (first citing AB Ex. A at 6-7 (the motion to dismiss answering brief prepared by the plaintiff in *Katz*, providing the language of the relevant provision from the *Katz* contract: "The Auditor shall have the authority (i) to determine if a party has complied with its obligations to provide access to the financial information required pursuant to this Section 2.9(d) and to order that a party comply with any such obligations, and (ii) to allow a party the right to amend any prior objection notice where it finds that such party had been prejudiced by the failure to have been provided access to such financial information."); then citing AB Ex. B at 12:6 (from the hearing transcript from *Katz*, in which counsel paraphrased the language quoted above)).

[77] RB at 4 n. 3.

[78] *Johnson & Johnson Fortis Advisors LLC*, 352 A.3d 229, 265 (Del. 2026) (noting that the Court avoids interpretations of contracts which render terms superfluous (citations omitted)).

14

Defendant contends the SPA enables the Auditor to resolve "all such disagreements" raised regarding the Earnout Statement and unresolved by the Parties, not just the "amounts" in dispute.[79] The Court instead agrees with Plaintiffs that the SPA provides the Auditor with the authority to resolve "only the amounts" disputed in the Earnout Statement.[80] "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[81] Defendant cites to the broad, general language articulating the authority of the Auditor, but Plaintiffs trump this by highlighting the more specific rule articulated in the alternative dispute resolution provision. The Auditor here has the authority to resolve *only* the amounts of the Earnout Statement which are disputed. "Thus, the [SPA] only contemplates the [Auditor] performing certain calculations and not an investigation into whether the parties otherwise complied with the [SPA]."[82] The open question regarding the Books-and-Records Issue is whether said Issue concerns a calculation problem or some other issue.

The Books-and-Records Issue concerns Defendant's decision to cease maintaining accounting records for each site after acquiring the business to reduce

---

[79] RB at 3 (citing SPA § 2.6(c)).
[80] AB at 16 (citing SPA § 2.4(d)(iii) (which is incorporated by reference into SPA § 2.6(c)).
[81] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).
[82] *Lytle*, 2026 WL 50135, at *7.

the Business's EBITDA.[83]  The issue presented here is not a calculation matter: it concerns the factors which underly the EBITDA calculation inputs.  Were the Court to send this issue to the Auditor, the instant dispute would not be resolved, as the Auditor would only be empowered to conduct an EBITDA calculation using the records in existence, not ascertain whether a party otherwise breached the SPA by failing to maintain those records in the first place.  That question is a legal issue suited for resolution by the Court and is not delegable *because* the parties did not specifically allocate it to the Auditor, unlike in *Katz*.

This case is analogous to *Bonola v. N. Am. Dental Mgmt., LLC*.[84]  In *Bonola*, the court explained that an alternative dispute resolution provision which allocated calculation disputes to a neutral accountant did not enable the accountant to resolve disputes concerning the provision of proper documentation.[85]  This case is also analogous to *Lytle v. Lytle Intermediate, LLC*.[86]  In *Lytle*, the court concluded that the relevant alternative dispute resolution provision authorized the neutral accountant to determine only the applicable earnout amount, which barred the court from sending claims concerning the provision of proper documentation to the accountant.[87]  In both cases, as here, the relevant alternative dispute resolution

---

[83] AB at 22.
[84] 2025 WL 3677422 (Del. Ch. Dec. 8, 2025)
[85] *Id*. at *6
[86] 2026 WL 50135.
[87] *Id*. at *7

16

provision enabled the accounting expert to resolve issues regarding the numerical amount of the earnout, not ancillary disputes regarding one party's provision of proper documentation in support of their earnout calculation.

Defendant's remaining arguments on this point are unavailing. Defendant argues the Auditor is well suited to ascertain which financial records should have been maintained and provided by Defendant, but this expertise does not override the fact cont the SPA does not allocate the issue to the Auditor.[88] While the Auditor is an accounting expert, the Court is capable of resolving this legal issue.[89]

Defendant also argues the Books-and-Records Issue was raised in Plaintiffs' Notice of Non-Acceptance and therefore should go to the Auditor.[90] For this point Defendant again cites *Katz*.[91] While this Court in *Katz* noted that the relevant disputes were raised in the formal objection to the buyer's true-up calculation, *Katz* does not provide that the presence of an issue on such an objection is dispositive.

---

[88] While in *Katz* the Court noted that the issues regarding which records were kept were "technical issues" in the auditor's bailiwick, the scope of the auditor provision there was broader than here, as noted above. The mere presence of a technical issue is not sufficient to defeat the Court's subject matter jurisdiction if the contract does not allocate that issue to alternative dispute resolution.

[89] Defendant's reliance on *Dolce v. WTS Int'l, LLC* is likewise unpersuasive. OB at 19 (citing 2024 WL 714128 (Del. Ch. Feb. 20, 2024)). *Dolce* did not address a situation in which a party allegedly breached the relevant contract by failing to keep proper records in the first instance. Instead, the Court only addressed a party's failure to *provide* such records during the alternative dispute resolution process and held that failure did not preclude the applicability of said process "after [the defendant] provides the required information." *Dolce*, 2024 WL 714128, at *3. The issue here is not whether Defendant's failure to cooperate with the alternative dispute resolution process should excuse Plaintiffs from following that process (as in *Dolce*), it is that Defendant allegedly chose certain accounting practices to reduce EBITDA, an issue outside of the Auditor's authority.

[90] OB at 18-19.

[91] OB at 19 (citing 2025 WL 2979825).

17

The Court looks to the language of the SPA itself to ascertain what issues go to the Auditor, not the way Plaintiffs articulated their objection to the Earnout Statement.[92] Regardless of which issues Plaintiffs identified in their Notice of Non-Acceptance, the disputes in question must be subject to resolution by the Auditor to go the Auditor. The Court will not use the Notice of Non-Acceptance's text as grounds to send additional disputes to the Auditor where the Parties contracted otherwise.

Plaintiffs' Books-and-Records Issue is not mere pleading around the scope of the Auditor's authority.[93] The SPA does not provide that issues regarding records maintenance go to the Auditor, and the Court will not send said issue to the Auditor for resolution.[94]

### 2. The Earnout Statement Issues fall outside of the Auditor's authority.

Defendant argues resolution of the Earnout Statement Issues falls within the exclusive authority of the Auditor.[95] The Earnout Statement Issues refer to various operational changes implemented after Defendant acquired the Business: (1)

---

[92] *Lytle*, 2026 WL 50135, at *5 (citing *Terrell*, 297 A.3d at 619).

[93] *Stone v. Nationstar Mortg. LLC*, 2020 WL 4037337, at *8 (Del. Ch. July 6, 2020) ("Delaware courts have rejected contractual parties' efforts to plead around the scope of a third-party decision-maker's authority by couching delegable disputes in questions of law." (citation omitted)).

[94] *AM Buyer LLC v. Argosy Inv. P'rs IV, L.P.* is inapplicable. 2024 WL 4024980 (Del. Super. Sept. 3, 2024), *aff'd sub nom. AM Buyer LLC v. Argosy Inv. P'rs IV, L.P*, 345 A.3d 958 (Del. 2025). In *AM Buyer*, the court determined the independent accountant had authority to resolve "all disputes" concerning the earnout, not merely the amounts in question. *Id*. at *11. The independent accountant's authority was thus broader than here, allowing for the resolution of broader ancillary issues.

[95] OB at 20.

changing the Business's bad debt policy, (2) offering the Business's employees a 401K match, (3) paying sales personnel bonuses, and (4) switching to a new, more expensive supplier.[96]  Plaintiffs contend these issues fall outside of the Auditor's authority.[97]

As already articulated, the language of the contract governs the scope of the Auditor's dispute resolution authority.[98]  Here, the SPA enables the Auditor to resolve "only the amounts" in dispute from the Earnout Statement.[99]

Defendant stretches the SPA's alternative dispute resolution provision too far. First, Defendant contends the SPA enables the Auditor to resolve all disputes regarding the Earnout, not just the amounts in question, which the Court already rejected above.[100]  Second, Defendant again highlights Plaintiffs' identification of the Earnout Statement Issues in Plaintiffs' Notice of Non-Acceptance, but that is not dispositive, as articulated above.[101]

Third, Defendant argues issues such as the bad debt policy concern technical accounting issues suited to the Auditor's expertise.[102]  The Court already explained that the contract, not the Auditor's expertise, governs the allocation of disputes.

---

[96] *Id.* at 17.
[97] AB at 16.
[98] *Lytle*, 2026 WL 50135, at *5 (citing *Terrell*, 297 A.3d at 619).
[99] SPA § 2.4(d)(iii).
[100] OB at 21.
[101] *Id.*
[102] *Id.*

Further, Defendant misapprehends the allegation regarding the bad debt policy. As Plaintiffs explain, the issue is not that the change to the bad debt policy violated an accounting standard prescribed by the SPA.[103]  The issue is that, regardless if the acceptability of the new policy under accounting principles, the change in policy was implemented *in order to* reduce EBITDA and prevent an earnout payment, in violation of the SPA's mandate that Defendant not do so.[104]  The *reason* for Defendant's conduct is operative here.

Here, *Katz* is again distinct, as the guardrails set to guide the buyer's post-closing conduct were limited to specifically required or prohibited actions.[105]  In *Katz*, the relevant contract enabled the buyer to operate the business in its sole discretion, without obligation to operate in such a way as to facilitate an earnout beyond following the specific mandates on conduct outlined in the agreement.[106]

Plaintiffs' claims do not target the specific misconduct—accounting or otherwise—employed by Defendant: they target the *reason* that conduct was implemented.  The focus on the *why* driving Defendant's actions takes this case beyond the purview of the Auditor, unlike in *Katz*.  In *Katz*, specific accounting

---

[103] AB at 25.
[104] *Id*. (citing SPA § 2.6(e)).
[105] 2025 WL 2979825 at *1.
[106] AB Ex. A at 7 (briefing from *Katz* which quotes the relevant contract and identifies the broader discretion granted to the buyer: "Finally, the Purchase Agreement expressly afforded Vivo Infusion 'the right to operate the Target Business in any way that [it] deems appropriate in [its] sole Discretion' and made clear that it had 'no obligation to operate the Target Business in order to achieve any payment of the True-Up Amount.'").

practices were allegedly taken in direct violation of the guardrails established by the contract, which dictated the appropriate accounting practices.[107] In *Katz*, the conduct itself constituted the purported breach. Here, the contract does not identify the specific actions allegedly taken by Defendant as wrongdoing. Instead, the SPA says Defendant cannot take these actions to prevent an earnout payment, no matter how facially valid the conduct may be. The intent behind Defendant's actions gives rise to the purported breach, not just the conduct.

This distinction reveals why the Auditor is not suited to resolve these issues, as the Auditor could conclude the actions taken by Defendant were satisfactory as a matter of accounting, but the Auditor would not have resolved the state of mind issues underlying Defendant's decisions and Plaintiffs' breach claim. To the extent Defendant asks the Court to dismiss the case so the Auditor can ascertain whether Defendant took certain actions in bad faith, Defendant asks the Court to stretch the alternative dispute resolution provision concerning "only the amounts" in dispute beyond the breaking point.[108]

---

[107] 2025 WL 2979825.

[108] The Court notes that the provision in *Katz* likewise gave the auditor authority to resolve "only the amounts" in dispute (alongside issues surrounding proper records production as discussed above). 2025 WL 2979825. There, the disputed conduct which the Court directed should go before the auditor concerned accounting philosophy and record keeping practices which allegedly directly violated the relevant agreement's post-closing guardrails. *See id.* at *2. Accounting philosophy is not disputed here: Plaintiffs do not contend the accounting methodology was faulty, instead essentially contending that Defendant chose an accounting methodology which, while potentially valid, was chosen because it reduced EBITDA. Record keeping is disputed, but the special

Defendant's decisions to offer the Business's employees a 401K match, to pay sales personnel bonuses, and to switch to a new supplier are not accounting issues. True, these decisions influence the Business's books (and Plaintiffs contend that effect was the motivation which drove these decisions), but that does not change their status as issues concerning the operation of the business rather than issues concerning accounting methodology. In *Katz*, the Court held that the issues to be sent to the auditor concerned "accounting practices"—not so with these issues.[109]

The real issue raised by the Earnout Statement Issues does not involve accounting expertise or accounting calculations: it involves an analysis into the state of mind of the Defendant in making certain operational decisions. This legal issue is not suited for resolution by the Auditor, who is only allocated issues regarding the amounts of the Earnout Statement. The Court cannot dismiss the breach of contract claim, insofar as it concerns the Earnout Statement Issues, in favor of alternative dispute resolution.

3. *Count I states a claim for which relief can be granted.*

Defendant argues Count I fails to state a claim for which relief can be granted.[110] This argument is brought pursuant to Rule 12(b)(6).[111]

---

provision enabling the auditor to resolve that issue in *Katz* is absent here. The difference in the alleged misconduct and distinct differences in the contracts distinguishes the two cases.

[109] 2025 WL 2979825 at *2.

[110] OB at 22.

[111] *Id.*

In Count I, Plaintiffs allege Defendant breached the SPA by taking actions "designed or intended to decrease EBITDA," further alleging the same actions "are [not] actions taken in good faith."[112] The thrust of Plaintiffs' complaint is the *reason* Defendant took certain actions constitutes a breach of contract. This invokes the even more limited pleading standard for intent and state of mind. Intent and state of mind need only be averred generally,[113] and bad faith can be alleged by showing "facts related to the alleged act taken in bad faith, and a plausible motivation for it."[114]

Defendant argues the Books-and-Records Issue and Earnout Statement Issues do not amount to breaches of the SPA.[115] First, Defendant argues the Books-and-Records Issue is based on the unreasonable conclusion that Defendant does not maintain *any* balance sheets or general ledgers because it does not maintain such records at the site-level.[116] As Plaintiffs explain, they do not contend Defendant fails to maintain any balance sheets or general ledgers, instead only arguing Defendant fails to keep *site-level* financial records, as Plaintiffs did before the sale of the Business.[117] Crediting Plaintiffs' clarification and the allegations in the Amended

---

[112] AC ¶ 101
[113] Del. Sup. Ct. Civ. R. 9(b).
[114] *Coca-Cola Beverages Fla. Hldgs., LLC v. Goins*, 2019 WL 2366340, at *3 (Del. Ch. 2019) (*quoting Clean Harbors, Inc. v. Safety-Kleen, Inc.*, 2011 WL 6793718, at *7 (Del. Ch. 2011)).
[115] OB at 23.
[116] *Id*. at 24.
[117] AB at 27-29.

Complaint that Defendant admitted to not maintaining site-specific balance sheets and ignored the request for site-specific general ledgers,[118] the Court does not view Plaintiffs' proposed inference—that Defendant does not maintain site-specific financial records[119]—as unreasonable, and will credit it for purposes of this motion to dismiss.

Next, Defendant contends Plaintiffs fail to draw the connection explaining why ceasing maintenance of site-specific financial records constitutes conduct taken to interfere with the EBITDA calculation.[120] Plaintiffs contend site-specific financial records are necessary for an accurate view of the business's financial performance, and the decision to deviate from this bookkeeping practice—a decision taken during the earnout period when Defendant's obligation to provide documentation for the EBITDA analysis ripened—constitutes an act taken to impede or interfere with the EBITDA calculation.[121] The Court finds Plaintiffs' conclusion requires only a reasonable inference which Plaintiffs may potentially prove following discovery.

The benchmark for pleadings in Delaware asks whether success on a claim is *possible*.[122] It is at least possible that Plaintiffs can prove that the change away from

---

[118] AC ¶ 40.
[119] AB at 29.
[120] OB at 25.
[121] AB at 27-28; AC ¶¶ 61-62
[122] *Cent. Mortg.*, 27 A.3d at 537 (reemphasizing the "reasonable 'conceivability'" standard); *id*. at 537 n. 13 ("Our governing 'conceivability' standard is more akin to 'possibility,' while the federal

24

site-level accounting obfuscates the accuracy of an EBITDA calculation and that Defendant thus chose to move away from that practice to enable an EBITDA calculation which was lower than the reality for this business model. The Complaint adequately pleads facts supporting this inference, showing Defendant's decision to move away from the old, purportedly superior practice, the relevant timing, and an explanation as to motive: to avoid an earnout payment.[123]  This reasoning enables the inference that Defendant chose a new, less accurate practice with deliberation.

Indeed, Plaintiffs' proposal for Defendant's motive is viable, as Plaintiffs allege Defendant avoided a $6.6 million earnout payment by ensuring EBITDA fell to within $200,000 below the earnout target—saving $6.6 million at the cost of less than 200,000.[124]  Accordingly, Plaintiffs state a claim as to the Books-and-records Issue.

Defendant next targets the Earnout Statement Issues, arguing that the Earnout Statement Issues constitute "challenges to the calculations and methodology reflected in the Earnout Statement," not disputes concerning Defendant's "operation of the [Business] post-closing."[125]  The Court disagrees, as articulated above. The Earnout Statement Issues concern Defendant's operations decisions after closing,

---

'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'" (citation omitted)).

[123] AC ¶¶ 61-62.

[124] AC ¶ 31

[125] OB at 25.

and the relevant inquiry here is not just the actions taken, but *why* Defendant took those actions. Defendant focuses on the effect these operations decisions have on EBITDA, which goes to Plaintiffs' claim for damages, but the *breach* is defined by the *intent* behind Defendant's choices.

Plaintiffs can state a claim for violation of a provision restricting Defendant's ability to take actions with a certain intention by alleging facially benign conduct taken at a suspicious time for nefarious purposes. Plaintiffs have done so here. Plaintiffs allege Defendant changed the bad debt accounting policy, implemented a 401K matching program, changed suppliers to a more expensive alternative, and implemented sales bonuses after closing in order to reduce EBITDA and prevent an earnout.[126] In other words, Defendant is alleged to have undertaken unnecessary expenses in order to save itself from a much higher earnout payment.[127] It is *possible* Plaintiffs' theory is true, and that the suspicious timing of the operational changes is not coincidental and violates Section 2.6(e)'s mandate that Defendant not intentionally interfere with EBITDA during the earnout period.

Plaintiffs identify the objected-to conduct, the suspicious timing, and a motive (which can be alleged generally)[128]—this is sufficient under Delaware's minimal

---

[126] AC ¶¶ 65-69.

[127] AC ¶ 31 (explaining that Defendant avoided a $6.6 million dollar earnout payment because the EBITDA was $200,000 short of the target).

[128] Del. Sup. Ct. Civ. R. 9(b).

pleading standard. Plaintiffs state a claim for breach via the Books-and-Records and Earnout Statement Issues.

### 4. *Discovery is necessary to ascertain whether Count I is barred by the statute of limitations.*

Defendant contends Count I is barred by the three-year statute of limitations for breach of contract actions, as the alleged breach for which Plaintiffs sued accrued in January 2022, over 3.5 years before Plaintiffs initiated this action.[129] Plaintiffs concede that the operative contractual provision expired in January 2022, and that they filed this action over 3.5 years later.[130] Plaintiffs argue the statute of limitations is tolled by the inherently unknowable injury doctrine, as Plaintiffs could not have known about their injury until at least August 31, 2022—when Defendant sent the Earnout Statement.[131]

Motions to dismiss based on a statute of limitations are governed by the principles of Rule 12(b)(6) articulated above[132] "Plaintiffs bear the burden of pleading facts that allow a reasonable inference that the statute of limitations should be tolled."[133] "[E]ven then, relief from the statute extends only to the point in time when Plaintiffs were put on inquiry notice."[134] "No theory will toll the statute

---

[129] OB at 26 (citing 10 *Del. C.* § 8106).
[130] AB at 31.
[131] AB at 31.
[132] *See, e.g. Erisman v. Zaitsev*, 2021 WL 6134034, at *1 (Del. Ch. Dec. 29, 2021) (noting that the motion to dismiss a time barred claim was brought under Rule 12(b)(6)).
[133] *Id*. at *13 (citations omitted).
[134] *Id*.

beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong."[135]  Accordingly, the court must not only assess whether the injury was inherently unknowable, but also "when (if ever) were Plaintiffs on inquiry notice of their claims."[136]

Plaintiffs contend their injury was inherently unknowable because Defendant, not Plaintiffs, ran the Business and Defendant did not disclose the actions it was taking until Plaintiffs received the Earnout Statement on August 31, 2022.[137]  The Court credits this position.  The allegations at issue concern operational decisions implemented at the Business after Plaintiffs turned over control, and it is possible, on this record, that Plaintiffs could not have known what decisions were being made, as well as the effect of those decisions on EBITDA, until they received the Earnout Statement.  Plaintiffs satisfy the first half of the inquiry.

This issue is complicated by the fact Plaintiff Wong stayed on at the Business after closing as an employee.[138]  Defendant argues Wong's status at the Business gave Plaintiffs inquiry notice regarding the operational changes about which they now complain.[139]  Plaintiffs counter that Wong's role was limited and he did not have access to the financial and operations information which would have revealed

---

[135] *Id*. (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007)).
[136] *Id*. (citation modified).
[137] AB at 32; AC ¶ 30.
[138] AC ¶ 48.
[139] OB at 27.

Defendant's alleged misconduct.[140]  The Amended Complaint corroborates this, alleging that Wong's access to information was limited.[141]

On reply, Defendant contends the Plaintiffs overstate the extent to which Wong was kept in the dark.[142]  Specifically, Defendant argues Wong should have known about the implementation of 401K matching, sales personnel bonuses (as his post-closing role was in sales), and the change in supplier (as he objected to the change).[143]  Defendant's argument asks the Court to make inferences against the non-moving party, in violation of the Rule 12(b)(6) standard of review.[144]

On the 401K matching, Defendant asks the Court to accept, in the absence of a record, that because Defendant implemented 401K matching, Wong must have known about it.  The Court is not persuaded the issue is ripe for resolution.  Factual issues remain regarding what Wong was told about the 401K matching program and when.  Further, the record does not indicate that Wong should have drawn the connection between the implementation of such a program and the failure to meet the earnout target.

---

[140] AB at 32-33.
[141] AC ¶ 49.
[142] RB at 11.
[143] *Id.*
[144] *Agahi v. Kelly*, 2024 WL 1134048, at *7 (Del. Super. Mar. 15, 2024) (noting that all reasonable factual inferences should be drawn in favor of the non-moving party in a Rule 12(b)(6) standard of review).

Even if Wong knew about the 401K matching, he may not have known that the program was a significant contributor to lowering EBITDA below the earnout threshold, since he lacked access to detailed financial information in his role at the Business.[145] As noted above, the thrust of Plaintiffs breach claim is not just the actions taken by Defendant of which Plaintiffs may or may not have been aware, but also the *intent* behind those actions and how those actions effected EBITDA.

The same issues block Defendant's arguments regarding the sales bonuses and change in suppliers. The record does not identify *when* Wong knew about these changes or identify why Wong should have known these expenditures would prevent the earnout.[146] Essentially, Defendant's argument asks the Court to expect Wong to have raised complaints about *every* major expenditure taken by the company because he should have known the expenditures were implemented to prevent Plaintiffs from receiving an earnout payment. The Court is not, at this stage in the proceedings, persuaded this is reasonable.

Defendant argues that Wong had access to sufficient financial information such that he could have identified Plaintiffs injury before the Earnout Statement was

---

[145] AC ¶ 49.

[146] The Amended Complaint notes that Wong requested that Defendant switch suppliers back to the prior, cheaper option, but does not articulate when he asked this. AC ¶ 39. He could have asked after the Earnout Statement put Plaintiffs on notice of Defendant's alleged breach. Further, his request to switch back to the other supplier, even if it predates the Earnout Statement, does not illustrate his knowledge that the choice of new supplier served to eliminate the potential for a forthcoming earnout payment.

delivered.[147]  Again, Defendant asks the Court to make a factual leap unpermitted by

Rule 12(b)(6).  The Amended Complaint pleads Wong had access to some of the

Business's sales data,[148] but that does not enable the Court to infer that the data Wong

accessed was sufficiently robust such that it enabled him to identify both the

operational changes at issue and their resulting effect on EBITDA.  Defendant

further argues the SPA gave Plaintiffs information rights, including the right to

access quarterly reports,[149] but the Amended Complaint does not indicate what

information was provided via those documents, preventing the Court from

ascertaining whether the quarterly reports put Plaintiffs on inquiry notice of

Defendant's breaches.[150]

---

[147] RB at 12.

[148] AC ¶¶ 48-49

[149] RB at 12-13 (citing SPA § 2.6(b)).

[150] Defendant cites *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, in which the Court of Chancery dismissed a counterclaim as barred by laches, employing a statute of limitations by analogy.  2022 WL 3010640, at *10-15 (Del. Ch. July 29, 2022).  The court in *HUMC* relied on Vice Chancellor Slights' opinion in *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.* for the proposition that information rights in a contract prevent the tolling of a statute of limitations, since the information provided by the contract would reveal the relevant wrongdoing.  2016 WL 4440476 (Del. Ch. Aug. 22, 2016).  In *Renco* and *HUMC*, the plaintiffs alleged their information rights were wrongly blocked by the defendant, and the court explained that, as soon as the defendant blocked the plaintiffs' information rights, the plaintiffs were no longer blamelessly ignorant of the defendants' wrongdoing.  *HUMC*, 2022 WL 3010640, at *14 (citing *Renco*, 2016 WL 4440476, at *15).  The issue here is not that the defendant allegedly blocked the plaintiffs' information rights prior to delivering the Earnout Statement, it is that the Court cannot ascertain what information was provided by Defendant.  Discovery will clarify what information Plaintiffs received and whether that information put them on inquiry notice of Defendant's misconduct.

*Erisman v. Zaitsev* is likewise inapposite, as there tolling was barred because the misconduct would have been revealed had the plaintiffs invoked their rights under the relevant agreements (which they failed to do) or had simply observed obvious phenomenon.  2021 WL 6134034, at *13-14 (Del. Ch. Dec. 29, 2021).  Because the Court here does not yet know what financial information

Factual issues block resolution on whether Plaintiffs were on inquiry notice of Defendant's breaches before Plaintiffs received the Earnout Statement in 2022. Accordingly, Plaintiffs have pled sufficient facts to enable the Court to make the reasonable inference that tolling is appropriate. The Court may revisit this issue after discovery reveals further information.

## II.     Count II is dismissed in part.

Defendant contends Plaintiffs' declaratory judgment claim should be dismissed.[151]  In Count II, Plaintiffs essentially seek a three part declaration: (1) that Defendant materially breached the SPA by providing an Earnout Statement which was neither prepared in good faith nor accompanied by reasonably detailed supporting documentation; (2) that Defendant's material breach obviates the need to follow the provisions in the SPA sending claims to the Auditor; and (3) that Plaintiffs are entitled to site-specific financial records which Defendant must provide in order to cure its material breach.[152]

Defendant focuses on Plaintiffs' allegation of *material* breach, contending Plaintiffs cannot claim a material breach of the SPA since they continued to perform

---

was received by Plaintiffs and whether the circumstances surrounding Defendant's facially innocuous conduct revealed obvious wrongdoing, factual issues prevent a finding as in *Erisman*.

After trial, the record may yet show, by a preponderance of the evidence, that Plaintiffs' claim is barred by the statute of limitations. *See Weinstein v. Luxeyard, Inc.*, 2022 WL 130973, at *4 (Del. Super. Jan. 14, 2022) (holding plaintiff's claims were barred by statute of limitations post-trial).

[151] OB at 27.

[152] AC ¶ 109.

under the contract after the alleged material breach.[153]  Plaintiffs counter they are not asserting a material breach while simultaneously seeking to enforce a benefit provided under the SPA.[154]

The Court agrees with Defendant: Plaintiffs cannot argue that the SPA was materially breached when Defendant provided the Earnout Statement because they subsequently operated as though the contract was still in effect.

As the Court of Chancery explained in *Post Holdings, Inc. v. NPE Seller Rep LLC*, when a party suffers a material breach by the other party, they must choose to continue performing the contract or cease performing and sue for total breach.[155]  A party cannot indicate an intention to continue operating under the contract and then reverse course and argue the contract should no longer be enforced against them because of the counterparty's breach.[156]

Here, Plaintiffs seek the Court's declaration that the alternative dispute resolution procedure no longer binds Plaintiffs because of Defendant's material breach.  Plaintiffs' argument fails because Plaintiffs continued to operate as though the contract was still in effect, negotiating with Defendant over the information Defendant would provide pursuant to contractual obligations and submitting the

---

[153] OB at 28.
[154] AB at 36.
[155] 2018 WL 5429833, at *5 (Del. Ch. Oct. 29, 2018) (citing 14 *Williston on Contracts* § 43.15 (4th ed. 2018))
[156] *Id*.

Notice of Non-Acceptance of the Earnout Statement.[157] *Post Holdings* is on point, as Plaintiffs continued to operate under the SPA and now allege the SPA is still a valid contract,[158] evincing their intention to enforce the SPA rather than seek to void its mandates.[159] Plaintiffs cannot seek to have their obligations under the SPA lifted by reason of Defendant's purported material breach—they have waived that power, to the extent they had it.[160]

Plaintiffs contend Defendant is trying to simultaneously argue the contractual disputes in this case must go before the Auditor while also arguing the time for the Auditor to resolve this case has passed.[161] Defendant responds that this argument is unripe, as Defendant has not tried to argue that Plaintiffs waived the right to bring their claims before the Auditor.[162]

The Court need not wade deep into this line of argument. As articulated above, the Books-and-Records Issue (along with other issues concerning Defendant's obligations to provide financial records supporting their Earnout

---

[157] *See e.g.* AC ¶¶ 32-41.

[158] AC ¶ 98.

[159] *Post Hldgs., Inc. v. NPE Seller Rep LLC*, 2018 WL 5429833, at *5 (Del. Ch. Oct. 29, 2018) (rejecting material breach claim where the plaintiffs alleged that the contract in question is a "valid, binding and legally enforceable written contract.").

[160] Defendant also argues the alleged breach cannot be declared material. OB at 29. This argument is mooted by the Court's finding that Plaintiffs waived their right to terminate because of the alleged material breach. Because Plaintiffs cannot terminate their obligations under the SPA, Defendant's argument that the breach is immaterial has become immaterial.

[161] AB at 34-35.

[162] RB at 16-17.

Statement) and the Earnout Statement Issues are not subject to resolution by the Auditor.[163]

Of the questions presented by Plaintiffs' Count II, the only portion which the Court *could* address (given Plaintiffs' waiver of the right to terminate the agreement for alleged material breach and avoid its contractual obligations) is the question of whether the failure to provide site-specific financial information in support of Defendant's EBTIDA calculation constitutes a breach (materiality notwithstanding) of the SPA's provisions governing the information Defendant would provide with the Earnout Statement. This declaration would not provide Plaintiffs with any substantive remedy, as Count II is not styled as a breach of contract claim for damages. Accordingly, the parties are directed to meet and confer regarding how Count II should proceed, considering the Court's findings herein, and articulate positions within 30 days of this Memorandum Opinion's publication.

## III. Count III is dismissed.

Defendant argues Count III, in which Plaintiffs allege a breach implied covenant of good faith and fair dealing, should be dismissed.[164] In Count III, Plaintiffs allege there is a gap in the SPA: the SPA provides Plaintiffs are responsible

---

[163] *See* Supra § I.
[164] OB at 30.

for underpaid taxes before the acquisition,[165] but does not explicitly address what happens if Plaintiffs *over*pay taxes before the acquisition, resulting in a refund.[166]

Defendant contends this claim fails because the SPA addresses the treatment of taxes but does not provide for Plaintiffs to receive tax refunds, so Plaintiffs cannot seek to rewrite the SPA using the implied covenant.[167] Essentially, Defendant contends the SPA's silence on the treatment of tax refunds is a deliberate omission, not a gap for the Court to fill. Plaintiffs argue the economic realities of the instant pass-through entity—in which the owners are financially responsible for the entity's taxes and should therefore receive any refund—support the logical inference that the SPA contains an unintentional gap to be filled, positing that the parties "did not 'anticipate' refunds."[168]

Plaintiffs overstep the bounds of the implied covenant. Under Delaware law, every contract contains an implied covenant of good faith and fair dealing.[169] The implied covenant can only fill "gaps" in a contract to accommodate a factual development that "*could not be anticipated*, not developments that the parties simply *failed to consider*."[170] The potential for overpayment of taxes and a subsequent

---

[165] AC ¶ 113 (citing SPA § 9.2)
[166] *Id*. ¶ 114.
[167] OB at 30.
[168] AB at 40-41.
[169] *Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 251 (Del. 2026) (citation omitted).
[170] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (citation omitted, emphasis added); *See also Johnson & Johnson v. Fortis*, 352 A.3d at 255 (restating the principles articulated in *Nemec* while noting "hindsight cannot correct oversight").

refund was fully anticipatable by the parties: far from being unheard of, tax refunds are a common occurrence. Accordingly, the Court cannot fill in the purported "gap" suggested by Plaintiffs here.

Indeed, the language of the SPA itself indicates the parties did anticipate tax issues, supporting the Court's view that the relevant development could have been anticipated. Section 7.2 provides a robust provision addressing the various tax concerns of the deal.[171] Section 9.2(a)(iii) provides that Plaintiffs will indemnify Defendant for underpaid taxes.[172] Clearly, the parties anticipated issues surrounding taxation and addressed what would happen in the event of underpayment. Taxes can be paid exactly, overpaid, or underpaid; all three options are predictable. The SPA's silence as to what would happen in the event of overpayment therefore does not constitute an unforeseeable development, instead constituting an omission which cannot be altered.

By emphasizing the economic realities of a pass-through entity in order to advocate for the provision of the tax refund to Plaintiffs, Plaintiffs ask the Court to "rebalance[e] economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[173] The Supreme

---

[171] SPA § 7.2.
[172] *Id*. § 9.2(a)(iii).
[173] *Nemec*, 991 A.2d at 1128; *See also Johnson & Johnson v. Fortis*, 352 A.3d at 255 (restating the principles articulated in *Nemec* while noting "hindsight cannot correct oversight").

Court of Delaware, in *Johnson & Johnson v. Fortis*, reiterated that the implied covenant cannot be employed in this way.[174] While the Court recognizes the economic realities of taxation of pass-through entities, the Court cannot rewrite the Parties' agreement and grant the tax refund to the Plaintiffs where a tax refund was predictable but the parties elected not to provide that it would go to Plaintiffs. Instead, the Court assumes the Plaintiffs could and should have acknowledged the possibility for a tax refund during negotiations over the SPA and chose not to push to have a refund released to Plaintiffs: potentially a bargaining-table concession that the Court will not reverse here. Plaintiffs' implied covenant claim fails and is dismissed.

## IV. Count IV is dismissed.

Defendant seeks dismissal of Plaintiffs' unjust enrichment claim, which is pled in the alternative to Plaintiffs' implied covenant claim.[175] Defendant contends the SPA governs the Parties' relationship on this issue, necessitating dismissal of the unjust enrichment claim.[176] Plaintiffs contend the SPA's silence as to the treatment of a tax refund indicates the SPA does not govern the parties relationship on this issue, enabling the bringing of the unjust enrichment claim.[177]

---

[174] *Johnson & Johnson v. Fortis*, 352 A.3d at 255.
[175] OB at 31.
[176] OB at 31.
[177] AB at 41-43.

"A claim for unjust enrichment must be dismissed if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."[178]   Courts have allowed unjust enrichment claims to proceed where an express contract does not "adequately address the parties' rights and duties at issue."[179]

The SPA, by Plaintiffs' own admission, "comprehensively addresses" the treatment of pre-closing taxes.[180]  Plaintiffs' unjust enrichment claim is thus belied by their own contention: if the SPA comprehensively addresses tax issues, it cannot fail to adequately address the parties' rights and duties regarding tax issues.  The Parties could have addressed what would happen if the pre-closing taxes were overpaid (a predictable development) and either chose not to or failed to do so.

Essentially, by bringing an unjust enrichment claim in the alternative to the implied covenant claim, Plaintiffs seek to circumvent the Supreme Court of Delaware's guidance that the implied covenant cannot be used to rebalance economic interests after a contract is executed.[181]  The Court will not condone this loophole.  The unjust enrichment claim fails for the same reason as the implied covenant claim: the parties could have included a provision remitting a refund to

---

[178] *Talkdesk, Inc. v. DM Trans, LLC*, 2024 WL 2799307, at *11 (Del. Super. May 31, 2024) (citation modified).

[179] *Avantix Lab'ys, Inc. v. Pharmion, LLC*, 2012 WL 2309981, at *12 (Del. Super. June 18, 2012).

[180] AB at 39.

[181] *Nemec*, 991 A.2d at 1128; *See also Johnson & Johnson v. Fortis*, 352 A.3d at 255 (restating the principles articulated in *Nemec* while noting "hindsight cannot correct oversight").

Plaintiffs but did not do so, and the Court will not rewrite the deal in order to correct this purported oversight. Effectively, there is no gap to fill in the SPA on this issue, so the SPA comprehensively addresses the relationship of the Parties on this issue, necessitating dismissal. Count IV is dismissed.

## CONCLUSION

For the reasons explained above, Defendant's Motion to Dismiss is **GRANTED** in part and **DENIED** in part. Specifically, the Court **DENIES** the Motion as to Count I, **GRANTS** the Motion as to Count III and IV, and **GRANTS IN PART** the Motion as to Count II. The Parties are directed to meet and confer regarding unresolved issues for Count II and provide a joint letter within 30 days of this Memorandum Opinion.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**

40